BABBITT FORD, INC., an Arizona corporation, Plaintiff-Appellant,

v.

The NAVAJO INDIAN TRIBE, through its Chairman, Peterson Zah, et al., Defendants-Appellees,

and

Tom and Lorraine Sellers, et al., Defendants-Cross-Appellants.

GURLEY MOTOR COMPANY, a New Mexico corporation, Plaintiff-Appellant,

v.

Peterson ZAH, individually and in his capacity as Chairman of the Navajo Tribal Council, et al., Defendants-Appellees.

Nos. 81–6054, 82–5002 and 81–6052.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 16, 1983.

Decided July 15, 1983.

Gerald W. Nabours, Mangum, Wall, Stoops & Warden, Flagstaff, Ariz., Alvin H. Shrago, Evans, Kitchel & Jenckes, Phoenix, Ariz., for plaintiffs-appellants.

Elizabeth Bernstein, Window Rock, Ariz., John MacKinnon, Tuba City, Ariz., for defendants.

Before MERRILL, CHOY, and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

In these consolidated appeals, Babbitt Ford, Inc. (Babbitt), and Gurley Motor Company (Gurley), seek reversal of an order of the district court denying declaratory and injunctive relief from enforcement of certain of the Navajo Tribe's (the Tribe)

vehicle repossession regulations. In their cross-appeal, Tim and Lorraine Sellers (Sellers) and Barney and Alice Joe (Joes) seek reversal of that portion of the district court's order enjoining the enforcement of the liquidated damages provision of the Navajo Tribe's regulation. We are asked to decide whether the Tribe has the sovereign power to enact and enforce civil laws regulating the conduct of non-Indians who come upon tribal land to repossess vehicles purchased outside reservation boundaries. We conclude that such power exists.

### I.

Babbitt and Gurley raise the following issues on appeal: (1) the Navajo Tribe has been divested, by treaty and federal common law, of the power to regulate non-Indian repossessions conducted on the reservation; (2) the Navajo Tribe may not exercise tribal authority over non-Indians because the Tribe has neither adopted a constitution nor organized under the Indian Reorganization Act; and (3) the district court lacked the authority to reform the Navajo repossession regulation by severing the liquidated damages provision from the rest of the statute. In their cross-appeal, the Sellers and Joes contend that (1) the Navajo Tribe has jurisdiction to regulate the conduct of non-Indians on the reservation and (2) the civil damage provision of the Navajo law is a legitimate exercise of tribal power.

1. 7 N.T.C. §§ 607–609 provide in full:
§ 607. Repossession of personal property. The personal property of Navajo Indians shall not be taken from land subject to the jurisdiction of the Navajo Tribe under the procedures of repossession except in strict compliance with the following:
1. Written consent to remove the property from land subject to the jurisdiction of the Navajo Tribe shall be secured from the purchaser at the time repossession is sought. The written consent shall be retained by the creditor and exhibited to the Navajo Tribe upon proper demand.
2. Where the Navajo refuses to sign said written consent to permit removal of the property from land subject to the jurisdiction of the Navajo Tribe, the property shall be removed only by order of a Tribal Court of the Navajo Tribe in an appropriate legal proceeding.
§ 608. Violations—Penalty

### PERTINENT FACTS

Babbitt is an Arizona car dealership doing business in Page and Flagstaff, Arizona. Gurley is a New Mexico Corporation doing business in Gallup, New Mexico. Both automobile dealerships are located within close proximity to the Navajo Indian Reservation. Each derives a substantial part of its income from sales to members of the Tribe. All automobile sales contracts with the Indians are negotiated at the dealership. Delivery of the automobiles also occurs off the reservation. The majority of these sales involve loan contracts that give the dealer the right to repossession by self-help upon default. Babbitt states it exercises this right approximately ten times per month upon vehicles owned by members of the Tribe and kept within reservation boundaries.

In 1968, the Navajo Tribal Council enacted regulations governing self-help vehicle repossessions on the reservation. Sections 607 through 609 of the Navajo Tribal Code, 7 N.T.C. §§ 607–609 provide that (1) written consent is required for repossession from either the owner of the vehicle or the tribal court; (2) any party who wilfully violates § 607 can be excluded from the reservation; and (3) liquidated damages may be granted to any owner whose personalty is repossessed on the reservation in violation of 7 N.T.C. § 607.[1]

(a) Any nonmember of the Navajo Tribe, except persons authorized by Federal law to be present on Tribal land, found to be in willful violation of 7 N.T.C. § 607 may be excluded from land subject to the jurisdiction of the Navajo Tribe in accordance with procedure set forth in 7 N.T.C. §§ 1903–1906.
(b) Any business whose employees are found to be in willful violation of 7 N.T.C. § 607 may be denied the privilege of doing business on land subject to the jurisdiction of the Navajo Tribe.
(c) Any Indian who violates any provision of 7 N.T.C. § 607 shall be guilty of a crime, and upon conviction shall be punished by a fine of not more than $100.
§ 609. Civil Liability.
Any person who violates 7 N.T.C. § 607 and any business whose employee violates such section is deemed to have breached the peace of the lands under the jurisdiction of the

In 1980, Babbitt entered the Navajo reservation and repossessed the vehicles belonging to the Sellers and the Joes. In neither case did Babbitt attempt to comply with the consent requirement of § 607. Both the Sellers and the Joes brought suit in the tribal court for violation of § 607.

The tribal court found Babbitt to be in violation of 7 N.T.C. § 607, and granted the Sellers and the Joes damages in accordance with 7 N.T.C. § 609.[2] Babbitt appealed this decision to the Navajo Appeals Court before bringing this action in the district court. Although Gurley's repossessions had not been challenged in Navajo Court, the district court concluded that the litigation threatened by the Tribe against Gurley's manner of repossession was sufficiently imminent so as to be ripe for review. Gurley and Babbitt agreed to have their claims consolidated and the district court so ordered on December 1, 1980.

JURISDICTION

■ The district court premised subject matter jurisdiction upon the presence of a federal question pursuant to 28 U.S.C. § 1331. We agree with the district court's analysis. The question presented by these claims—the extent to which treaties and federal case law divest the Navajo tribe of the power to exercise civil jurisdiction over

Navajo Tribe, and shall be civilly liable to the purchaser for any loss caused by the failure to comply with 7 N.T.C. §§ 607–609.

If the personal property repossessed is consumer goods (to wit: goods used or bought for use primarily for personal, family or household purposes), the purchaser has the right to recover in any event an amount not less than the credit service charge plus 10 percent of the principal amount of the debt or the time price differential plus 10 percent of the cash price.

Purchaser means the person who owes payment or other performance of an obligation secured by personal property, whether or not the purchaser owns or has rights in the personal property.

2. The Sellers were awarded $476.75 and the Joes were awarded $4,455.75.

3. *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). Congress has the power to cancel unilaterally rights granted by Indian treaty. *Lone Wolf v.*

non-Indians conducting repossessions on reservation land—is a sufficient basis for § 1331 jurisdiction. *See Cardin v. De La Cruz*, 671 F.2d 363 (9th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). *Cf. Trans-Canada Enterprises, Ltd. v. Muckleshoot Indian Tribe*, 634 F.2d 474, 476 n. 4 (9th Cir.1980) (this court affirmed dismissal on jurisdictional grounds but instructed district court to grant leave to plead § 1331 jurisdiction).

INHERENT POWER TO EXERCISE CIVIL JURISDICTION OVER NON–INDIANS

■ Indian tribes have long been recognized as sovereign entities, "possessing attributes of sovereignty over both their members and their territory . . . ." *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) (citations omitted). This sovereignty is not absolute. Tribal sovereignty is subject to limitation by specific treaty provisions,[3] by statute at the will of Congress,[4] by portions of the Constitution found explicitly binding on the tribes,[5] or by implication due to the tribes' dependent status.[6]

■ Consequently, Indian tribes are "no longer 'possessed of the full attributes of sovereignty' . . ." *Santa Clara Pueblo v.*

*Hitchcock*, 187 U.S. 553, 556, 23 S.Ct. 216, 217, 47 L.Ed. 299 (1903).

4. *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978); *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56, 72, 98 S.Ct. 1670, 1675, 1684, 56 L.Ed.2d 106 (1972) (Congress has plenary authority to limit, modify, or eliminate the powers of local self-government which tribes otherwise possess, but Congress' intent to do so must be clearly expressed).

5. *Trans-Canada Enterprises, Ltd. v. Muckleshoot Indian Tribe*, 634 F.2d 474, 476–77 (9th Cir.1980).

6. *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) (the Indian Tribe's "incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised") (footnote omitted).

*Martinez,* 436 U.S. 49, 55–66, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978) (citations omitted). Nevertheless, Indian tribes "remain a 'separate people, with the power of regulating their internal and social relations,' ... [making] their own substantive law in internal matters, ... and ... [enforcing] that law in their own forums[.]" *Id.* (citations omitted).

■ Indian tribes also retain the inherent sovereign power to exercise "some forms of civil jurisdiction over non-Indians on their reservations ..." *Montana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981). The Supreme Court has repeatedly recognized tribal courts "as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." *Santa Clara,* 436 U.S. at 65, 98 S.Ct. at 1681 (footnote and citation omitted). Tribal law-making institutions also have been recognized as competent legislatures. *Id.* at 66, 98 S.Ct. at 1681.

A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.... A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on *fee lands* within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe....

*Montana,* 450 U.S. at 564–65, 101 S.Ct. at 1257–58 (1981) (emphasis added) (citations omitted).

■ The power to exercise tribal civil authority over non-Indians derives not only from the tribe's inherent powers necessary to self-government and territorial management, but also from the power to exclude nonmembers from tribal land. *See Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 141–44, 102 S.Ct. 894, 903–05, 71 L.Ed.2d 21 (1982). This "limited authority" over nonmembers "does not arise until the nonmem-

ber enters the tribal jurisdiction ... [by entering] tribal lands or [conducting] business with the tribe." *Id.* at 142, 102 S.Ct. at 904. Nonmembers lawfully entering tribal lands—for example, pursuant to contract with the tribe—nonetheless remain "subject to the tribe's *power* to exclude them." *Id.* at 144, 102 S.Ct. at 905 (emphasis in original). A tribe has the power "to place conditions on entry, on continued presence, or on reservation conduct ..., [and] nonmember[s] who [enter] the jurisdiction of the tribe [remain] "subject to the risk that the tribe will later exercise [this] sovereign power." *Id.* at 144–45, 102 S.Ct. at 905 (footnote omitted).

Thus, in *Merrion* the Supreme Court concluded that the Jicarillo tribe had the power to impose a severance tax on non-Indians conducting mining activities on the reservation pursuant to a contract with the tribe. In *Montana,* the Court concluded that a tribe may exclude nonmembers from hunting on reservation land or condition permission to hunt by charging a fee or establishing limitations. 450 U.S. at 557, 101 S.Ct. at 1254. The *Montana* Court held, however, that the tribe could not prohibit nonmembers from hunting on fee lands located within reservation boundaries that were owned by nonmembers. *Id.* at 566–67, 101 S.Ct. at 1258–59.

The *Montana* Court offered three reasons for this distinction. First, the non-Indians, who were hunting and fishing on non-Indian fee lands, had not "[entered into] any agreements or dealings with the Crow Tribe so as to subject themselves to tribal civil jurisdiction." *Id.* at 566, 101 S.Ct. at 1259. Second, there had been no suggestion that the hunting and fishing activities on non-Indian fee land so "[threatened] the Tribe's political or economic security as to justify tribal regulation." *Id.* Finally, the complaint had failed to allege that such activities "[imperiled] the subsistence or welfare of the Tribe." *Id.* (footnote omitted). In sum, the nonmembers had not entered the jurisdiction of the Crow Tribe.

Recent decisions of this Circuit have upheld the enforcement of tribal economic and

health and welfare regulations against non-members present on the reservation or transacting business with the tribe. *See, e.g., Cardin v. De La Cruz,* 671 F.2d 363 (9th Cir.) (tribe retains inherent sovereign power to impose its health, building, and safety regulations on non-Indian's business, which is located on land that non-Indian owns in fee, but also is within reservation boundaries), *cert. denied,* —— U.S. ——, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982); *Confederated Salish and Kootenai Tribes v. Namen,* 665 F.2d 951 (9th Cir.) (court upheld tribe's right to regulate federal common-law riparian rights of non-Indians who owned reservation land to which the tribe had beneficial title), *cert. denied,* —— U.S. ——, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982); *Knight v. Shoshone and Arapahoe Indian Tribes,* 670 F.2d 900 (10th Cir.1981) (court held as valid exercise of tribal power zoning regulation that affected fee lands owned by non-Indians located within reservation).

Congress has acknowledged that such regulation is a necessary tool of self-government and control. *See, e.g., White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 149, 100 S.Ct. 2578, 2586, 65 L.Ed.2d 665 (1980) (There is a "general federal policy of encouraging tribes 'to revitalize their self-government' and to assume control over their 'business and economic affairs' ") (quoting *Mescalaro Apache Tribe v. Jones,* 411 U.S. 145, 151, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973)). As the Supreme Court noted, the Senate Judiciary Committee "as early as 1879" stated:

> We have considered [Indian tribes] as invested with the right of self-government and jurisdiction over the persons and property within the limits of the territory they occupy, except so far as that jurisdiction has been restrained and abridged by treaty or act of Congress. Subject to the supervisory control of the Federal Government, *they may enact the requisite legislation to maintain peace and good order, improve their condition,* establish school systems, and aid their people in their efforts to acquire the arts of civilized life.

S.Rep. No. 698, 45th Cong., 3d Sess. 1–2 (1879) (emphasis added) (quoted in *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 140, 102 S.Ct. 894, 903, 71 L.Ed.2d 21 (1981)).

■ The Navajo consent regulation at issue in this matter is a necessary exercise of tribal self-government and territorial management: the regulation is designed to keep reservation peace and protect the health and safety of tribal members. The Navajo reservation covers a vast expansion of land. Repossession of an automobile has the potential to leave a tribal member stranded miles from his or her nearest neighbor. A repossession without the consent of the tribe member also may escalate into violence, particularly if others join the affray.

Such conduct, in our view, clearly "threatens or has some direct effect on the . . . health and welfare of the tribe." *Montana,* 450 U.S. at 566, 101 S.Ct. at 1258 (citations omitted). The enactment of regulations aimed at preventing such occurrences reflects the Tribe's concern for the safety and welfare of persons on the reservation. For this reason, the regulations at issue here are a valid exercise of tribal jurisdiction according to the principles set forth in *Montana.*

*Merrion* provides yet another basis for upholding the exercise of tribal civil jurisdiction over non-Indians repossessing automobiles on Navajo reservation land. As noted earlier, the "limited authority" over nonmembers does not arise until they enter tribal lands or conduct business with the tribe. *Merrion,* 455 U.S. at 142, 102 S.Ct. at 904. *See also Montana,* 450 U.S. at 564, 101 S.Ct. at 1257 (tribe may regulate activities of nonmembers, "who enter consensual relationships, with the tribe or its members, through commercial dealing, contracts, leases or other arrangements") (citations omitted). Both Babbitt and Gurley conduct business with tribal members, and they must enter tribal lands to repossess the subject of that business—automobiles. By doing so, they have entered the Tribe's jurisdiction.

The Navajo Tribe could have completely excluded the representatives of Babbitt and Gurley from entering the reservation. *Merrion,* 455 U.S. at 144, 102 S.Ct. at 905. Instead it chose to condition entry to repossess vehicles upon obtaining permission of the Tribe or the individual car owner to do so. As noted earlier, the Tribe has the "power to place conditions on entry, on continued presence, [and] on reservation conduct ..." *Id.* Regulating the conduct of non-Indians repossessing automobiles on reservation land is a valid exercise of the Tribe's power to exclude nonmembers from the reservation. *See Quechan Tribe of Indians v. Rome,* 531 F.2d 408, 410 (9th Cir. 1976) ("In the absence of treaty provisions or congressional pronouncements to the contrary, the tribe has the inherent power to exclude non-members from the reservation.") (citing *Williams v. Lee,* 358 U.S. 217, 219, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1833).

■ Babbitt nevertheless contends that it did not consent to the Tribe's exercise of civil jurisdiction because it did not conduct business with the Tribe, but only with individual Indians. This notion of individuality was put to rest succinctly by the Supreme Court in *McClanahan.* In rejecting the view that a state law imposing income tax on individual Indians did not affect the Tribe, the Court stated: "when Congress legislates on Indians matters, it has, most often, dealt with the tribes as collective entities. But those entities are, after all, composed of individual Indians, and the legislation confers individual rights." 411 U.S. at 181, 93 S.Ct. at 1267. *Cf. Littell v. Nakai,* 344 F.2d 486, 490 (9th Cir.1965) (Navajo Tribe need not have a proprietary or other legally recognized interest in the particular litigation or its outcome in order for the controversy to be one concerning internal affairs), *cert. denied,* 382 U.S. 986, 86 S.Ct. 531, 15 L.Ed.2d 474 (1966).

■ Babbitt additionally maintains that the Tribe has no civil jurisdictional authority over Babbitt's repossession conduct on the reservation because the sales contracts were entered into off the reservation land. Babbitt further argues that it is immune from the Tribe's civil repossession laws because the sales contracts gave Babbitt the right to enter the Navajo reservation to conduct repossessions in accordance with Arizona law. We disagree.

In *Merrion,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), the Supreme Court rejected an argument similar to the one advanced by Babbitt. The petitioners, who in 1953 had entered into mineral leases with the Tribe, challenged the Tribe's power to tax their activities. They argued that their leaseholds entitled them to enter the reservation and exempted them from further exercises of the Tribe's sovereign power. 455 U.S. at 145, 102 S.Ct. at 905. The Court characterized the argument as one that "[confused] the Tribe's role as commercial partner with its role as sovereign." *Id.* at 145–46, 102 S.Ct. at 905–06. The Court explained that:

> *Whatever place consent may have in contractual matters and in the creation of democratic governments, it has little if any role in measuring the validity of an exercise of legitimate sovereign authority.* Requiring the consent of the entrant deposits in the hands of the excludable non-Indians the source of the tribe's power, when the power instead derives from sovereignty itself. Only the Federal Government may limit a tribe's exercise of its sovereign authority.... *Indian sovereignty is not conditioned on the assent of a nonmember; to the contrary, the nonmember's presence and conduct on Indian lands are conditioned by the limitations the tribe may choose to impose.*

> Viewed in this light, the absence of a reference to the tax in the leases themselves hardly impairs the Tribe's authority to impose the tax. Contractual arrangements remain subject to subsequent legislation by the presiding sovereign.... *Without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's juris-*

diction, and will remain intact unless surrendered in unmistakable terms.

*Id.* at 147–48, 102 S.Ct. at 906–07 (citations and footnotes omitted) (emphasis added).

The Court made clear that the mere existence of a "lawful property right to be on Indian land" does not immunize the non-Indian from the tribe's power "to place other conditions on the non-Indian's conduct or continued presence on the reservation." *Id.* at 144–45, 102 S.Ct. at 905–06 (footnote omitted). Those entering the tribe's jurisdiction remain "subject to the risk that the tribe will later exercise its sovereign power." *Id.* at 145, 102 S.Ct. at 905. Thus, by entering the reservation to conduct repossessions, Babbitt and Gurley are subject to the Tribe's exercise of sovereign power.[7] The Tribe has the authority to exercise civil jurisdiction over Babbitt and Gurley.

## II. DIVESTITURE OF CIVIL JURISDICTION

### A.

Babbitt and Gurley argue that the 1850 and the 1868 treaties between the Navajo Tribe and the United States divest the Tribe of the power to regulate trade and intercourse. Thus, we are told, the plain language of these treaties prohibits the Tribe from exercising civil jurisdiction over non-Indians.

The treaty language at issue provides in pertinent part:

Treaty of 1850:

(Article III) The government of the said states having the sole and exclusive right of regulating the trade and intercourse with the said Navajos . . .

Treaty of 1868:

If bad men among the whites or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also to reimburse the injured persons for the loss sustained.

Both Babbitt and Gurley contend that the "sole and exclusive" language of the 1850 Treaty means that only the United States and not the Navajo Tribe may regulate in the area of trade and intercourse.

Babbitt additionally argues that the words "bad men among the Whites" in the 1868 Treaty require the Navajo Tribe to relinquish all civil jurisdiction over non-Indians. Babbitt asserts that, upon signing this Treaty, disputes with non-Indians became subject to the jurisdiction of the United States.

The district court, in a concise analysis, rejected an interpretation of the Treaties that would divest the Navajos of civil jurisdiction over non-Indians *present* on the reservation. Noting that neither Babbitt nor Gurley introduced evidence of the history of the 1850 or 1868 Treaty, the district court found no reason to reject an interpretation favoring concurrent civil jurisdiction on the part of the Tribe and the federal government.[8] We agree. Furthermore, in light of previous Supreme Court interpretations of the Treaties at issue in this appeal, the arguments of Babbitt and Gurley are meritless.

---

7. *See also Littell v. Nakai,* 344 F.2d 486, 490 (9th Cir.1965), *cert. denied,* 382 U.S. 986, 86 S.Ct. 531, 15 L.Ed.2d 474 (1966). There, this court rejected the argument that since some of the alleged acts between the non-Indian and Indian occurred off the reservation, the tribal court had no jurisdiction over the non-Indian. The locus of some particular act, we held, is not conclusive as to tribal jurisdiction.

8. Gurley correctly argues that historical evidence of tribal custom is a proper basis for judicial conclusions about the present effect of

Indian treaty provisions. *United States v. Lower Elwha Tribe,* 642 F.2d 1141, 1143 (9th Cir.) (citations omitted), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 161 (1981). Gurley, however, never presented any such evidence to the district court before the court entered its final judgment permanently enjoining enforcement of section 609. The hearing on the preliminary injunction was consolidated with a trial on the merits pursuant to Fed.R. Civ.P. 65(a)(2).

■ The law is settled that simply because a Treaty fails to delineate specific powers of a tribe does not mean that the tribe has been divested of such powers. *See, e.g., United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). The Supreme Court "has referred to Treaties made with the Indians as '*not a grant of rights to the Indians,* but a grant of rights from them—*a reservation of those not granted.*'" *Wheeler,* 435 U.S. at 327 n. 24, 98 S.Ct. at 1088 n. 24 (quoting *United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905) (emphasis added)).

■ In *Wheeler,* the Supreme Court examined the 1850 and 1868 Treaties between the United States and the Navajo Tribe and concluded that the Tribe and the government had concurrent jurisdiction to punish Indians for violations of tribal law.[9] The Court stated that "[a]lthough both of the Treaties ... provided for punishment by the United States of Navajos who commit crimes against non-Indians, nothing in either of them deprived the Tribe of its own jurisdiction to charge, try, and punish members of the Tribe for violations of tribal law." 435 U.S. at 324, 98 S.Ct. at 1086. The notion that the internal affairs of Indians remained exclusively within the jurisdiction of whatever tribal government existed, the Court asserted, is an understanding "'[i]mplicit in these Treaty terms....'" *Id.* (citations omitted).[10]

In *McClanahan,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), Arizona argued that it could tax individual Navajos living on the reservation because the 1868 Treaty failed to provide expressly that the State of Arizona could not do so. In rejecting this argument, the Court noted that even though the Treaty did not explicitly state that Navajos were to be free from state law or exempt from state tax, the Court had "interpreted the Navajo Treaty to preclude extension of state law—including state tax law—to Indians on the reservation." 411 U.S. at 175, 93 S.Ct. at 1264 (citations omitted). The Treaty, the Court explained, "is not to be read as an ordinary contract agreed upon by parties dealing at arm's length with equal bargaining positions." *Id.* at 174, 93 S.Ct. at 1263. The Navajos promised to keep the peace and, in return, the Treaty reserved certain lands for their exclusive use and occupancy and for exclusion of non-Navajos. "[C]ircumstances such as these ... have led [the] Court in interpreting Indian treaties, to adopt the general rule that '[d]oubtful expressions are to be resolved in favor of [the Indians]....'" *Id.* (citation omitted).

This canon of construction, taken together with the tradition of Indian independence, led the Supreme Court to conclude that the reservation of certain lands to the Navajos "was meant to establish the lands as within the *exclusive sovereignty of the Navajos under general federal supervision.*" *Id.* at 175, 93 S.Ct at 1263 (emphasis added). Accordingly, the Court held that absent congressional consent, Arizona could not impose a state income tax on income earned by a reservation Indian solely on the reservation.

In *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), the Court examined the 1868 Navajo Treaty and concluded that the Tribe had exclusive jurisdiction over a collection action brought by a non-Indian against individual Indians. The

---

9. Here, however, jurisdiction is limited to civil jurisdiction. This result is due to the holding in *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) that Indians lack criminal jurisdiction over non-Indians.

10. Of course, "in the exercise of the powers of self-government as in all other matters, the Navajo tribe ... remains subject to ultimate federal control." *United States v. Wheeler,* 435 U.S. 313, 327, 98 S.Ct. 1079, 1088, 55 L.Ed.2d 303 (1978). Such control, however, does not create the Indians' power to govern themselves. *Id.* at 328, 98 S.Ct. at 1088. "That Congress has in certain ways regulated the manner and extent of the tribal power of self-government does not mean that Congress is the source of that power." *Id.*

plaintiff, a non-Indian who operated a store on reservation lands, instituted the action in state court for goods sold on credit to the Indians. The Court determined that the exercise of state jurisdiction would infringe on the Tribe's right to self-government a right recognized by Congress in the 1868 Treaty. In reaching this conclusion Court noted that:

> Implicit in [the] treaty terms [providing that no one was to enter the land permanently set apart for the Navajos except government personnel] was the understanding that the internal affairs of the Indians remained exclusively with the jurisdiction of whatever tribal government existed. Since then Congress and the Bureau of Indian Affairs have assisted in strengthening the Navajo tribal government and its courts.

*Id.* at 221, 79 S.Ct. at 271 (citation omitted).

In the Court's view, there could be "no doubt" that the exercise of state jurisdiction "would undermine the authority of the tribal courts over Reservation Affairs," thereby infringing on the Indians' right to govern themselves. *Id.* at 223, 79 S.Ct. at 272. The Court characterized as "immaterial" the fact that the plaintiff was a non-Indian. The Court reasoned that:

> [h]e was on the Reservation and the transaction with an Indian took place there.... Congress recognized [the Navajo's] authority [over their reservation] in the Treaty of 1868, and has done so ever since. If this power is to be taken away from them, it is for Congress to do it....

358 U.S. at 223, 79 S.Ct. at 272 (emphasis added) (citations omitted).

The Court's reasoning is equally applicable here. The transaction regulated—repossession of automobiles on reservation land—occurs *on* the reservation. The fact that the contract was signed off the reservation does not foreclose, as Babbitt suggests, the Tribe's right to self government or the authority of tribal courts over reservation affairs. *Cf. Merrion,* 455 U.S. at 144, 102 S.Ct. at 905 (lawful property right to be

11. Babbitt's opening brief at 28.

on Indian land does not immunize non-Indian from Tribe's power to place conditions on non-Indian's conduct or continued presence on reservation).

*Williams, McClanahan,* and *Wheeler* support our determination that the Navajo treaties have not divested the Tribe of the power to exercise civil jurisdiction over non-Indians. The tradition of Indian independence, coupled with the general rule that " 'doubtful [treaty] expressions are to be resolved in favor of [the Indians],' " *McClanahan,* 411 U.S. at 174, 93 S.Ct. at 1263 (quoting *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930)), has led the Supreme Court to conclude that the reservation of land to the Navajos by these treaties establishes Navajo lands as within the exclusive sovereignty of the Tribe under general federal supervision. *Id.* at 175, 93 S.Ct. at 1263. Nothing in the language of either treaty quoted by Babbitt and Gurley leads us to believe that we may overlook the Supreme Court's interpretation of these treaties.

### B.

Both Babbitt and Gurley argue that the Tribe's exercise of civil jurisdiction here is inconsistent with overriding national interests. Citing *Montana,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) and *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), Babbitt contends that "the nonexistence of Indian tribal civil jurisdiction over non-Indians constitutes the general rule of the federal common law and the existence of any such jurisdiction would constitute an exception to that rule." [11] Babbitt asserts that the regulations at issue here are outside any such exception.

In our view, the Tribe's exercise of civil jurisdiction over non-Indians conducting repossession on reservation land is not within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status. The Supreme Court has

implied divestiture of sovereign powers where the Tribes' dependent status is necessarily inconsistent with the Tribes "freedom independently to determine [its] external relations." *Wheeler,* 435 U.S. at 326, 98 S.Ct. at 1088. Thus, Indian Tribes may no longer (1) freely alienate to non-Indians the land they occupy, *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 667–68, 94 S.Ct. 772, 777–78, 39 L.Ed.2d 73 (1974); (2) enter into direct commercial or governmental relations with foreign nations, *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 519, 8 L.Ed. 483 (1833); (3) criminally prosecute nonmembers in tribal courts which do not accord the full protection of the Bill of Rights, *Oliphant,* 435 U.S. 191, 210–12, 98 S.Ct. 1011, 1021–22, 55 L.Ed.2d 209 (1978); or (4) exercise civil authority over the conduct of non-Indians on fee lands within the reservation (lands not owned by the Tribe) if such conduct does not threaten or does not have a direct effect on the political integrity, economic security, or health and welfare of the Tribe. *Montana,* 450 U.S. at 565–66, 101 S.Ct. at 1259–59.

In *Cardin v. De La Cruz,* 671 F.2d 363 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982), we addressed a similar argument concerning *Montana, Oliphant* and implicit divestitures of sovereign power. There, the Quinault Indian Tribe had obtained and enforced a tribal court order closing plaintiff's reservation grocery store for violations of the tribal health and safety code. Plaintiff, a non-Indian, brought an action in district court seeking injunctive relief from the enforcement of the tribal court order and a ruling that such orders were outside the retained jurisdiction of the Tribe. The district court granted the relief and the Tribe appealed. This court reversed, holding that the Tribe did retain the civil jurisdiction over non-Indians necessary to enforce their health and safety regulations. Although the plaintiff argued that *Montana* and *Oliphant* prohibited such a conclusion, we declined to apply these holdings so broadly. We reasoned that:

> [t]o hold that Indian tribes cannot exercise civil jurisdiction over non-Indians

would, when combined with *Oliphant,* eliminate altogether any tribal jurisdiction over persons not members of the tribe, and thus, reduce to a nullity the Supreme Court's repeated assertions that Indian tribes retain attributes of sovereignty over their territory, not just their members.

*Id.* at 366 (footnote omitted); *see also Confederated Salish & Kootenai Tribes v. Namen,* 665 F.2d 951, 962–64 (9th Cir.) (water pollution regulations "falls squarely within the exception recognized in *Montana* "), *cert. denied,* —— U.S. ——, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982).

In our view, *Cardin's* reasoning is applicable to the enforcement of the repossession regulations at issue here. These regulations are a legitimate exercise of the Tribe's inherent powers. Civil jurisdiction to enforce these regulations is a necessary exercise of tribal self-government and territorial management. The limitation on tribal authority over nonmembers does not derive from an implicit divestiture of sovereign power as Babbitt contends. Rather, the limitation stems from the "significant territorial component to tribal power: a tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe." *Merrion,* 455 U.S. at 142, 102 S.Ct. at 904. This limitation has no application where, as here, a nonmember conducts both business with individual Indians and repossessions on reservation lands.

### C.

Gurley, in a related argument, contends that even if the Tribe has the power to exercise civil jurisdiction, it may not do so unless it has adopted a Constitution pursuant to the Indian Reorganization Act, 25 U.S.C. §§ 476, 477 (IRA) and has obtained the approval of the Secretary of the Interior. Absent these restrictions, "non-Indians will be subject once again—as they were before the treaties of 1850 and 1868—to the

unlimited, unfettered and often unfair exercise of authority by the Navajo Tribe."[12]

■ Gurley maintains that there are no constraints on the Navajo Tribe to ensure that tribal actions comport with due process of law because (1) the Tribe has never adopted a constitution which places a due process limitation on the exercise of tribal power; and (2) the due process limitations set forth in the United States Constitution are inapplicable to Indian tribes, *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978). Gurley correctly notes that, in *Merrion,* the Supreme Court referred to secretarial approval and the Federal Government's ultimate power to take away a Tribe's power to tax as constraints that "minimize [the] potential concern that Indian tribes will exercise the power to, tax [unfairly] ... and ensure that any exercise of the tribal power to tax will be consistent with national policies." 455 U.S. at 141, 102 S.Ct. at 903.

Similar constraints are present here. Congress may take away the Tribe's power to regulate repossessions conducted on reservation land. Moreover, tribal courts must comply with the Indian Civil Rights Act, 25 U.S.C. § 1302, which grants constitutional protections to those who are subject to the Tribe's jurisdiction.[13] A non-Indian who has been denied due process in the tribal court may seek habeas corpus relief in the district court. Under these circumstances, we do not believe that the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government.

■ We also reject Gurley's view that *Merrion* requires the Tribe to adopt a constitution pursuant to the IRA before it can exercise civil jurisdiction over non-Indians. In *Merrion,* the Supreme Court rejected the view that a tax imposed by a tribe on non-Indian mining activities on the reservation would unduly burden interstate commerce and thus violate the Interstate Commerce Clause. In reaching this conclusion, the Court noted that judicial review of a state tax under the Interstate Commerce Clause is improper once Congress has acted. 455 U.S. at 154, 102 S.Ct. at 910. The Court explained:

> Here, Congress has affirmatively acted by providing a series of federal checkpoints that must be cleared before a tribal tax can take effect. Under the [IRA] ..., a tribe must obtain approval from the Secretary before it adopts or revises its constitution to announce its intention to tax nonmembers. Further, before the ordinance imposing the severance tax challenged here could take effect, the Tribe was required again to obtain approval from the Secretary.

*Id.* at 155, 102 S.Ct. at 911 (footnote and citations omitted).

Thus, the Court did not hold, as Gurley suggests, that such federal checkpoints are required for the *exercise* of all tribal regulations. Rather, the Court held that it was not the function of the judiciary "to strike down a tax that has traveled through the precise channels established by Congress, and has obtained the specific approval of the Secretary." *Id.* at 156, 102 S.Ct. at 911. Neither *Merrion* nor the language of the IRA requires a tribe to adopt a constitution before exercising civil jurisdiction over non-Indians.[14]

**12.** Gurley's opening brief at 15.

**13.** *See United States v. Wheeler,* 435 U.S. 313, 327–28, 98 S.Ct. 1079, 1088–89, 55 L.Ed.2d 303 (1978). No claim has been made that the tribal action here was in violation of the Indian Civil Rights Act.

**14.** The IRA provides in pertinent part:
Any Indian tribes, residing on the same reservation, shall have the right to organize for its common welfare, and *may* adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservations, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and bylaws, when ratified as aforesaid and approved by the Secretary of the Interior, shall be revocable by an election open to the same voters and conducted in the same manner as hereinabove provided. Amendments to the constitution and bylaws may be ratified and

## D.

In their cross-appeal, the Sellers and the Joes contend the district court erred in holding that the regulatory damage provision of section 609 conflicts with overriding interests of the federal government.[15] We agree.

Section 609 provides that any person who repossesses goods in violation of section 607 is deemed to have breached the peace and "shall be civilly liable . . . for any loss caused [thereby] . . ." 7 N.T.C. 609.[16] If "consumer goods" are repossessed in violation of section 607, the purchaser of such goods may recover either (1) actual damages or (2) in any event an amount not less than the credit service charge plus ten percent of the principal amount of the debt or the time price differential plus ten percent of the cash price." 7 N.T.C. 609.

The district court, 519 F.Supp. 418, concluded that the validity of section 609 depended on whether it was compensatory or penal in nature. The district court construed *Oliphant* as prohibiting tribal regulations that conflict with the overriding national interest in "protect[ing] United States citizens from 'unwarranted intrusions on their personal liberty.'" 519 F.Supp. at 431 (citations omitted). Unwarranted intrusions, the district court noted, are more likely to occur when "the purpose is to punish than when the purpose is to compensate." *Id.* Thus, the district court reasoned that section 609 would be invalid to the extent that it was penal in nature. *Id.* at 432.

To determine the nature of section 609, the court adopted an analysis employed in contract actions concerning the validity of contested liquidated damage provisions. In the court's view, the similarity between the minimum damage provision of section 609 and a liquidated damage contract clause justified application of the analysis to the provision.

In applying this analysis, the district court noted that liquidated damage provisions become penal when they over-compensate the wrong to which they are directed. 519 F.Supp. at 433. In the court's view, section 609 overestimates the right, and therefore is penal in nature, where the repossession is "substantively justified by the parties' contract and the applicable law thereto." 519 F.Supp. at 433. In such instances, the Indian is only deprived of the right "not to have his vehicle repossessed until the dealer complies with § 607." *Id.* Accordingly, the provision is "inconsistent with overriding [federal] interests . . . since it awards damages in excess of the damage actually suffered . . . and, therefore, punishes non-Indians." *Id.* Such punishment, the court asserted, is beyond the limits of tribal sovereign power according to *Oliphant.*

In our view, the district court's reliance on a contract law is misplaced. The issue presented by these appeals is the validity of an exercise of legitimate sovereign authority. Section 609 is not a liquidated damage provision agreed upon by parties to a contract; consequently, its validity is not to be measured by common law limitations on *contractual* agreements. "Only the Federal Government may limit a tribe's exercise of its sovereign authority." *Merrion,* 455 U.S. at 147, 102 S.Ct. at 907 (citation and footnote omitted).

---

approved by the Secretary in the same manner as the original constitution and bylaws. 25 U.S.C. § 476. (emphasis added).

The IRA "[reflects] a new policy of the Federal Government and [aims] to put a halt to the loss of tribal lands through allotment. It gave the Secretary of the Interior power to create new reservations, and tribes *were encouraged* to revitalize their self-government through the adoption of constitutions and bylaws . . ." *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 151, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973).

**15.** In view of our decision to reverse this portion of the judgment, we need not address Babbitt's argument that the court was without power to sever § 609 from the rest of the regulation.

We also note that neither party challenges 7 N.T.C. § 608 which codifies the power of the Tribe to exclude violators of 7 N.T.C. § 607.

**16.** The Tribe's statutory format, which presumes a breach of the peace, parallels § 9–503 of the Uniform Commercial Code.

We believe that the district court has interpreted the limitation set forth in *Oliphant* too broadly. In *Oliphant,* the Supreme Court held that a tribe's criminal prosecution of non-Indians in tribal courts that do not accord the full protections of the Bill of Rights conflicts with overriding national interests. *See Oliphant,* 435 U.S. at 210, 98 S.Ct. at 1021. Section 609 does not subject non-Indians to criminal prosecution in tribal courts that do not afford that protection of the Bill of Rights. Rather, section 609 subjects non-Indians to civil damages when they enter the reservation and repossess personal property without complying with the consent provision of section 607.

■ Tribal power includes "a broad measure of civil jurisdiction over the activities of non-Indians on Indian reservation lands in which the tribes have a significant interest." *Washington v. Confederated Tribes of the Colville Reservation,* 447 U.S. 134 at 153, 100 S.Ct. 2069 at 2081, 65 L.Ed.2d 10. By enacting § 609 the Tribe has furthered its social policy to prevent violence in the repossession of automobiles. This same protection against breaches of the peace has been made a part of the law of many states; the provisions of section 609 concerning mandatory minimum award without proof of actual damages are not unique. The language of § 609 closely parallels other attempts at consumer protection legislation,[17] and is in fact identical to the damage measure set out in § 9–507(1) of the Uniform Commercial Code (U.C.C.). This U.C.C. code section has been adopted without material modification by both Arizona, Ariz.Rev.Stat.Ann. § 44–3153 (1967),

and New Mexico, N.M.Stat.Ann. § 55–9–507 (1978).

■ Numerous cases have held that under U.C.C. § 9–507(1) an improper auto repossession results in liability for the statutory minimum. In each of these cases, proof of creditor's failure to give notice of resale, just as under § 609 proof of the creditor's failure to obtain consent, is considered sufficient to support the minimum damage award. None of these cases require a showing of actual damage and all of the cases consider an automobile to be a consumer good.[18] Those states that have adopted § 9–507(1) of the U.C.C. have acted to protect the safety and property of all persons within their boundaries. The adoption of § 609 realistically increases the likelihood of achieving these same goals.

The district court's judgment is affirmed in part and reversed as to § 609.

---

**17.** *See, e.g.,* 15 U.S.C. § 1640(a)(2)(A), the civil liability section of the Truth in Lending Act and § 5.203(1)(a) of the Uniform Consumer Credit Code.

**18.** *See, e.g., Garza v. Brazos County Federal Credit Union,* 603 S.W.2d 298 (Tex.Civ.App. 1980); *Georgia Central Credit Union v. Coleman,* 155 Ga.App. 547, 271 S.E.2d 681 (1980); *Allard v. Ford Motor Co.,* 139 Vt. 162, 422 A.2d 940 (1980); *Wells v. Central Bank of Alabama, N.A.,* 347 So.2d 114 (Ala.Civ.App. 1977). *But see Wilmington Trust Co. v. Con-*

*ner,* 28 UCC 900, 415 A.2d 773 (Del.1980) (award of the UCC § 9–507(1) minimum must be based on proof that the particular automobile repossessed was a consumer good; since this factor cannot be presumed and no evidence on the issue was received, the court reversed and remanded for further proceedings).