# Supreme Court of the Navajo Nation

**Arizona Public Service Company, Respondent/Appellant,**
**v.**
**Office of Navajo Labor Relations, Complainant/Appellee.**
**Decided October 8, 1990**

## OPINION

Before TSO, Chief Justice, BLUEHOUSE and AUSTIN, Associate Justices.

Neil Vincent Wake, Esq., Phoenix, Arizona, for the Appellant; and David P. Frank, Esq., and Wilson Yellowhair, Esq., Navajo Nation Department of Justice, Window Rock, Navajo Nation (Arizona), for the Appellee.

Opinion delivered by TSO, Chief Justice.

This is a direct appeal from a February 9, 1987 administrative decision of the Navajo Labor Relations Board. The Navajo Supreme Court has jurisdiction to hear appeals from final administrative orders, as provided by law. 7 N.T.C. § 801(a). Appeals from the final decisions of the Board are provided by 15 N.T.C. § 613.

## CASE BEFORE THE COURT

The Arizona Public Service Company (APS) is an Arizona corporation engaged in the business of electric power generation. In 1953, the Navajo Nation granted a tribal permit to the Utah Construction and Mining Company (UCMC) to begin exploration of coal beds south of Fruitland, Navajo Nation (New Mexico). In 1957, UCMC obtained a lease to lands where large deposits of coal were found, and later it joined with APS to develop the Four Corners Power Plant at the mine mouth. P. Reno, *Mother Earth, Father Sky, and Economic Development* 107 (1981).

On December 1, 1960, APS obtained a lease from the Navajo Nation to "construct and operate . . . a large thermal electric power plant" near the lands subject to the UCMC lease. The plant built under the 1960 lease, the Four Corners Power Plant, eventually joined other mine-mouth generation plants owned by WEST (Western Energy Supply and Transmission Associates), a consortium of twenty-three utility companies. The plant serves customers as far away as Los Angeles. Reno at 107. The original 1960 lease was amended by a "Supplemental and Additional Indenture of Lease" on July 6, 1966, and it was amended again in 1985.

This dispute arises from a hiring policy adopted by APS on July 15, 1983. It was a company-wide policy which sought to deal with problems of nepotism, and it addressed two categories of employees. It dealt with blood relations of current employees by providing that such relatives could be only hired for positions which were two or more supervisory levels removed from relative employees. It prohibited the hiring of applicants related by marriage to current employees, namely spouses, fathers-in-law, mothers-in-law, daughters-in-law, sons-in-law, brothers-in-law, and sisters-in-law. APS also developed an employment application form to apply the policy. It contained the question, "Do you have any relatives working for APS? Name (if yes)." If the applicant named a relative by marriage in one of the prohibited degrees, the application was rejected.

This policy was developed by Joseph Gelinas, APS' Vice-President of Employee Relations. It is a general policy which is applicable to all APS operations, both within and without the Navajo Nation. The reason for the policy was reported complaints about APS hiring practices by non-employees and a resulting public perception that APS favored relatives in employment. A July 13, 1983 memorandum from Gelinas to managers and supervisors stated that while no significant problems arise from hiring blood or in-law relatives, the change in hiring policy was designed to meet "potential problems."

The policy had a significant impact on employees and job applicants at the Four Corners Plant. For the period between November, 1983 and September, 1986, a total of 18 employees lost their jobs or were denied employment because of the policy. One employee's application was rejected because he was determined to be an in-law to an employee when the relation was in fact that of two men married to sisters, so the applicant was in fact the brother-in-law of the employee's wife and not the employee. While the mistake was corrected within ten days, the applicant had to wait two and one-half months for another opening. One employee, who was told he was ineligible for rehire because his wife was employed, obtained a divorce in order to qualify for employment. Fourteen lost their jobs or were denied employment because of a brother-in-law employee, two because of a husband, one because of a wife, and one because of a sister-in-law. One employee resigned rather than accept a reprimand for failing to disclose a relationship, her brother-in-law was fired for nondisclosure, and another was refused rehire. Fifteen of the affected positions were those of laborers, and the remaining three positions were clerical, mechanic, and management jobs. In all, thirteen men and five women were affected.

The enforcement agency which addressed this problem was the Office of Navajo Labor Relations (ONLR). It was originally established in 1972, with a name change to the Division of Equal Opportunity and Employment in 1976. In 1985, it was redesignated as ONLR. 15 N.T.C. § 201. It has broad powers to regulate, enforce, and determine violations of Navajo Nation labor law, and it has the authority to file complaints of violations of the Navajo Preference in Employment Act with the Navajo Labor Relations Board. 15 N.T.C. § 610(d) . It

may act upon the complaint of an individual or take action upon its own initiative. 15 N.T.C. § 610(b)(3).

The Navajo Labor Relations Board is the board of directors of ONLR. 15 N.T.C. § 603(1). It is a five-member board, and three members constitute a quorum for the purpose of doing business. 15 N.T.C. §§ 203(a), 205(a). It has broad enumerated powers and duties to enforce Navajo Nation labor and employment law, and it has the specific power to hear complaints brought by ONLR and issue determinations and enforcement orders for violations of Navajo Nation labor laws. 15 N.T.C. §§ 610(e)(1), 612.

The law at issue here is the Navajo Preference in Employment Act (NPEA), adopted on August 1, 1985 by Navajo Tribal Council Resolution CAU-63-85, and codified at 15 N.T.C. §§ 601-619. NPEA is a general labor code, and it supplanted the Navajo Nation labor policy adopted in 1958 (15 N.T.C. §§ 601-612 (repealed 1985)). The NPEA contains requirements that employers exercise preferential hiring practices in favor of Navajos, employment procedures, just cause employment tenure, health and safety guarantees, and training requirements. 15 N.T.C. § 604(b).

The two employer obligations of that section which are most applicable to this case are: "All employers shall use nondiscriminatory job qualifications and selection criteria in employment"; and "All employers shall maintain a safe and clean working environment and provide employment conditions which are free of prejudice, intimidation and harassment." 15 N.T.C. § 604(b)(7), (9).

The nepotism policy was adopted on July 15, 1983 and it was applied to 18 persons over a 34-month period between November 13, 1983 and September 15, 1986. On October 24, 1986, ONLR filed a complaint against APS. The complaint was served on October 29, 1986, and APS answered on November 10, 1986. The Navajo Labor Relations Board (Board) heard the complaint on the merits on December 15-16, 1986, and rendered the decision which is the subject of this appeal on February 9, 1987.

The actual case or controversy before the Court is whether the Board correctly found that APS' nepotism policy violated 15 N.T.C. § 604(b).

## ISSUES

The Court has carefully reviewed the administrative record and considered the arguments of the parties in briefs and upon oral argument. The issues are as follows:

1. Whether the Navajo Nation has the power to regulate labor relations of employers doing business within its outer boundaries, including the requirement of nondiscriminatory employment standards and the prohibition of prejudice, intimidation and harassment?

2. Whether the Navajo Preference in Employment Act prohibits discrimination on the basis of marital status?

3. Whether the Navajo Labor Relations Board, acting as a quasi-judicial body, has jurisdiction over the Arizona Public Service Company?

4. Whether the Board, in rendering its February 9, 1987 decision, violated any procedural right of due process or violated its own law to such an extent that the decision must be overruled as a matter of law?

# I

## VALIDITY OF THE ACT

We hold that the cited provisions of the 1985 Navajo Preference in Employment Act are valid exercises of the treaty powers, inherent powers, and police power of the Navajo Nation. The Navajo Nation has the power to enact legislation to regulate labor and employment, including provisions to protect the civil rights of workers.

This is an important holding, and we will discuss treaty powers, inherent powers, and the police power at length to show precisely why NPEA is a valid exercise of those powers.

## A. THE TREATY OF 1868

The United States of America and the Navajo Nation or Tribe of Indians concluded a treaty on June 1, 1868. The United States Senate advised ratification of it on July 25, 1868, and President Andrew Johnson proclaimed it on August 12, 1868. 15 Stat. 667. The United States recognizes the status of the Navajo Nation as such because that term is in the preamble of the treaty.

Indian treaties are an exercise of the treaty powers of the United States under its Constitution, and they have the same dignity as treaties with foreign nations. *United States v. 43 Gallons of Whiskey*, 93 U.S. 188 (1876). They are not, as some state, an anachronism, and they have full force and effect as the, "supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI.

To understand the contemporary importance of the Treaty of 1868 we must look back to the conflict which gave rise to it — the Navajo War of 1863-64, and The Long Walk.

> Though short, the Navajo War of 1863-64 proved to be one of the most violent and decisive military campaigns ever waged against a major North American Indian tribe.

G. and R. Bailey, *A History of the Navajos* 9 (1986). In 1864, over 8,500 Navajos were force-marched a distance of 400 miles to a concentration camp called Bosque Redondo. *Id.* at 10; L. Bailey, *The Long Walk* 224 (1964). That number represented 85% of an estimated Navajo population of slightly over 10,000, not

including uncounted Navajos killed during the war, or dead of exposure or disease in the process of being transported to Bosque Redondo. G. and R. Bailey, *Id.* at 9-10, 309, n.1.

> It was this trip which would forever be remembered in sadness by the Dine. The traumatic experience of being uprooted and transported from a country that was their sacred home to a land alien to them, would forever be indelibly stamped on their minds. The hardships endured, along with suffering and death which many a Navajo met, would be remembered painfully as — THE LONG WALK.

L. Bailey at 166 (emphasis in the original).

The United States peace commissioners were Lt. General William T. Sherman and Colonel Samuel F. Tappan. They arrived at Fort Sumner on May 28, 1868, spending three days for the negotiation of the treaty, which was executed on June 1, 1868. When the Navajos were finally released from their four-year captivity on June 18, 1868, the column of Navajos and four companies of cavalry was ten miles long. L. Bailey at 232-233.

There is a great deal of Navajo oral history on their recollection of the treaty negotiations, but the official record of council proceedings prepared by the peace commission gives some insight into what was discussed and concluded between May 28th and June 1, 1868. "Council Proceedings," in M. Link, *Treaty between the United States of America and the Navajo Tribe of Indians* 1-11 (1968).

On May 28, 1868, the parties held general discussions as a preliminary to a treaty draft. General Sherman opened them stating that "whether right or wrong the Navajos have been at war with us," and "before we discuss what we are to do with you, we want to know what you have done in the past and what you think about your reservation here." *Id.* at 1. Barboncito, speaking for the Navajos present, explained the misery and hardship of the Navajo captives, including the deaths caused in "the bringing of us here," crop failures, and hardships. Barboncito stressed the importance of returning to the original lands of the Navajos:

> Our Grand-fathers had no idea of living in any other country except our own and I do not think it right for us to do so as we were never taught to. When the Navajos were first created four mountains and four rivers were pointed out to us, inside of which we should live, that was to be our country and was given to us by the first woman of the Navajo tribe.

*Id.* at 2. General Sherman replied, "You are right, the world is big enough for all the people it contains and all should live in peace with their neighbors." *Id.* at 4. He continued,

> [W]e want to do to you what is right — right for you — and right to us as a people; If you will live in peace with your neighbors, we will see that your neighbors will be at peace with you — The government will stand between you and other Indians and Mexicans.

*Id.* at 4. The last reference was of course to the people of the New Mexico Territory, which was largely Hispanic until later waves of Anglo-Americans arrived. This was a promise that the United States would protect the political integrity of the Navajo Nation; its right to "live in peace." Sherman also replied, "we must have a clearly defined boundary line and know exactly where you belong to, you must live at peace and must not fight with other Indians." *Id.* at 5. He said that the Navajos could seek military assistance for any who might trouble them, but that they would have the right to repel enemies "with bows and arrows and guns you of course can drive them out but must not follow beyond the boundary line." *Id.* at 5. This was a promise of territorial integrity and the right to use the ultimate governmental power of the exercise of force to protect it. The May 28, 1868 proceedings concluded with Sherman's instructions to return the next day to settle the boundary lines of the Navajo Nation:

> Tomorrow at 10 o'clock I want the whole tribe to assemble at the back of the Hospital and for you then to delegate ten of your men to come forward and settle about the boundary line of your own country which will be reduced to writing and signed by those ten men.

*Id.* at 6.

The next day, when Sherman asked if ten men had been chosen, they stood (Delgadito, Barboncito, Manuelito, Largo, Herrero, Chiqueto, Murerto de Hombre, Hombro, Narbono, and Armijo) and "the Navajos upon being asked if satisfied with these ten men, unanimously responded — Yes." *Id.* at 7. Sherman then indicated their role under the treaty to be signed.

> We will now consider these ten men your principal men and we want them to select a chief the remaining to compose his Council for we cannot talk to all the Navajos. Barboncito was unanimously elected Chief — now from this time out you must do as Barboncito tells you, with him we will deal and do all for your good. When we leave here and go to your own country you must do as he tells you and when you get to your country you must obey him or he will punish you, if he has not the power to do so he will call on the soldiers and they will do it.

*Id.* This instruction established the form of the government-to-government relationship between the Navajo Nation and the United States. It was in fact a direction to form an elective council with a chief executive. The broad mention of power, "do as Barboncito tells you," and the instruction to obey him on pain of federal intervention, provides a basis for the complete governmental authority of the Navajo Nation, through its council and elected leader. *Id.* The democratic nature of the discussion is reinforced by the notes, showing that Sherman asked again:

> We want to put everything on paper so that hereafter there may be no misunderstanding between us, we want to know if the whole Navajo nation is represented by those present and if they will be bound by the acts of these ten men — unanimous response of yes.

*Id.*

On May 30, 1868, General Sherman read the complete text of the treaty. It was translated and approved by the Navajos, and the treaty council adjourned for the treaty signing on Monday, June 1, 1868, at 9:00 a.m. *Id.* at 10-11.

These preliminary discussions are important to an understanding of the Treaty of 1868. They show that the Navajo negotiators, mainly Barboncito and Ganado Mucho, raised many questions about the power and authority of the Navajos on their return to their homeland. Sherman's responses show that the Navajo negotiators raised many such questions, and while the questions may not have been written down, the replies show the Navajo concerns. Sherman guaranteed the right of political integrity for the Navajo Nation, along with full powers to maintain territorial integrity. He expected a democratic council with a chief executive. Both that council and the chief executive would have broad powers.

There are several provisions in the text of the treaty executed on June 1, 1868 which concern us here. Article II of the Treaty (15 Stat. 668) contains a boundary description of the original Navajo Reservation, followed by the language that the lands within it

> shall be, and the same is hereby, set apart for the use and occupation of the Navajo tribe of Indians, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit among them.

This makes it clear that these are distinctly and solely Navajo lands, and that only those Indians whom the Navajos permit to live among them may do so. It also means that the benefits of the treaty lands, including employment or the fruits of industry, solely belong to the Navajo People. Navajos may, of course, admit other Indians to such benefits. Article II continues:

> [T]he United States agrees that no person except those herein authorized to do, and except such officers, soldiers, agents, and employes [sic] of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article.

This treaty language gives rise to the general exclusion power which is said to be the source of a great deal of tribal authority. This article refers to "employes [sic] ... of the Indians" as well. In the broader sense APS is an "employee" of the Navajo Nation within the meaning of the treaty, because it develops Navajo Nation resources. The treaty clearly envisaged the ability of the Navajo Nation to hire its own employees and agents, and to the extent that APS is considered to fall within this provision, the Navajo Nation has the power to regulate it or exclude it for disobedience to the sovereign.

There are other provisions of the treaty which may be used to either reinforce or evidence Navajo governmental authority. For example, the "bad men among

the whites" language of Article I, which provides for claims against any non-Indian who "shall commit any wrong upon the person or property of the Indians," is in fact a guarantee of federal reinforcement of Navajo sovereignty. The same is true with the Article IV provision that there shall be a United States agent among the Navajos, who must live among them and keep an "office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by or against the Indians as may be presented for investigation." Finally, Article XIII provides that the Navajo Reservation is the "permanent home" of the Navajos, implying all that goes with a home - the right to keep it in good order.

There have been several important federal court decisions which interpret this language, but a preliminary consideration is the nature of the Navajo Nation as a state (using that term in the international law sense). In a 1959 suit against the Navajo Tribal Council, plaintiffs argued that the First Amendment to the United States Constitution applies to Indian nations and tribes as it does to the States. *Native American Church of North America v. Navajo Tribal Council*, 272 F.2d 131, 134 (9th Cir. 1959). The court said, "Indian tribes are not states. They have a status higher than that of states. They are subordinate and dependent nations possessed of all powers as such only to the extent that they have expressly been required to surrender them by the superior sovereign, the United States."

In the recent case of *Native Village of Noatak v. Hoffman*, while addressing whether tribal claims may overcome state sovereign immunity, the same court said that the treaty clause of the Constitution (Art. I, Sec. 8, Cl. 3) is a consent to suit by tribes because, "Indian tribes are more like the United States and the individual states of the United States than they are like individual citizens or like foreign states [who cannot sue]." 896 F.2d 1157, 1163 (9th Cir. 1990). As it is with the states, the Navajo Nation has broad governmental powers which are guaranteed by the supreme law of the land — the Treaty of 1868.

In 1959, the United States Supreme Court decided the question of whether a non-Indian general store operator could sue a Navajo Indian in state court to collect for goods sold on credit on the Navajo Reservation. *Williams v. Lee*, 358 U.S. 217, 217-218 (1959). One of the grounds for the ruling that the plaintiff must bring his suit only in the Navajo Tribal Court was the Treaty. The Court said:

> On June 1, 1868, a treaty was signed between General William T. Sherman, for the United States, and numerous chiefs and headmen of the 'Navajo nation or tribes of Indians.' At the time this document was signed the Navajos were an exiled people, forced by the United States to live crowded together on a small piece of land on the Pecos River in eastern New Mexico, some 300 miles east of the area they had occupied before the coming of the white man. In return for their promises to keep peace, this treaty 'set apart' for 'their permanent home' a portion of what had been their native country, and provided that no one, except United States Government personnel, was to enter the reserved area. Implicit in these treaty terms, as it was in the treaties with the Cherokees involved in *Worcester v. Georgia*, was the understanding that the

> internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed. Since then, Congress and the Bureau of Indian Affairs have assisted in strengthening the Navajo tribal government and its courts.

_Id._ at 221-222. This was the first of several cases upholding Navajo Nation jurisdiction over non-Indians, and the Court said, "It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there." _Id._ at 223. The ultimate holding of the case was that the Navajo Nation may regulate the commercial activities of non-Indians who do business on the Navajo Reservation.

In _McClanahan v. State Tax Comm'n of Arizona_, the Supreme Court again applied the Treaty, using its "for the use and occupation of the Navajo tribe of Indians" term to hold that the State of Arizona cannot impose a personal income tax upon an enrolled member of the Navajo tribe. 411 U.S. 164, 173-175, 165-166 (1973). "[S]ince the signing of the Navajo treaty, Congress has consistently acted upon the assumption that the States lacked jurisdiction over Navajos living on the reservation." _Id._ at 175.

In _United States v. Wheeler_, the Supreme Court went beyond the text of the Treaty of 1868 in applying it to decide that Indian governments are not an instrumentality of the United States for the purpose of double jeopardy. 435 U.S. 313 (1978). Speaking to the power of Congress to limit tribal power the Court said, "But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." _Id._ at 323. The Treaty of 1868 did not fully define Navajo governmental power because of many reserved rights which are not enumerated in it. The Supreme Court acknowledged this by saying, "This Court has referred to treaties made with the Indians as 'not a grant of rights to the Indians, but a grant of rights from them — a reservation of those not granted.'" _Id._ at 327, n. 24 (citation omitted). Finally, the Court showed there is a policy consideration for supporting Navajo common law. It specifically recognized tribal customs, and stated why they are important for Navajos:

> 'Navaho' is not their own word for themselves. In their own language, they are dine, 'The People' ... This term is a constant reminder that the Navahos still constitute a society in which each individual has a strong sense of belonging with the others who speak the same language and, by the same token, a strong sense of difference and isolation from the rest of humanity.

_Id._ at 331, n. 33 (citation omitted).

The next important decision involved an attempt of the United States Government to regulate Navajo industry within the Navajo Nation. In _Donovan v. Navajo Forest Products Industry_, the Secretary of Labor sought to enforce the Occupational Safety and Health Act of 1970 against a wholly-owned tribal enter-

prise. 692 F.2d 709, 710 (9th Cir. 1982). In holding that a general federal statute could not apply to the Navajo Nation, the court used the exclusion power of Article II of the Treaty of 1868, and concluded that:

> [T]he application of OSHA to NFPI would constitute abrogation of Article II of the Navajo Treaty relating to the exclusion of non-Indians not authorized to enter upon the Navajo Reservation. Furthermore, it would dilute the principles of tribal sovereignty and self-government recognized in the treaty. The Navajos have not voluntarily relinquished the power granted under Article II of the treaty. Neither has that power been divested by congressional enactment of OSHA; to so imply would be to dilute the recognized 'attributes of [Indian tribal] sovereignty over both their members and territory.'

*Id.* at 712 (citation omitted).

That same court's decision in *Babbitt Ford v. Navajo Nation*, is quite relevant to this decision. 710 F.2d 587 (9th Cir. 1983). The case involved two automobile dealerships which were dissatisfied with the Navajo Nation statutes which prohibited self-help vehicle repossessions, required plaintiffs to seek a tribal court order for repossession (in the absence of consent by the owner), and provided remedies by way of exclusion from the reservation and liquidated damages. *Id.* at 590. Babbitt Ford and Gurley Motors attacked application of the statute to non-Indian businesses which, they claimed, entered into enforcible contracts off-reservation which permitted self-help repossession. They attacked the power to regulate business in this fashion as well as the legitimacy of the Navajo Government itself. The court pointed to the exclusion power and its application to those doing business within the Navajo Nation:

> Nonmembers lawfully entering tribal lands — for example, pursuant to contract with the tribe — nonetheless remain 'subject to the tribe's *power* to exclude them.' A tribe has the power 'to place conditions on entry, on continued presence, reservation conduct....' [and] nonmember[s] who [enter] the jurisdiction of the tribe [remain] 'subject to the risk that the tribe will later exercise [this] sovereign power.'

*Id.* at 592 (citation omitted; emphasis and brackets in the original). As for the assertion that the automobile sales contracts were all the permission Babbitt Ford needed to enter the Navajo Nation, the court used the analogy of mineral lessees who challenged tribal power to tax their activities. "The Court characterized the argument as one that '[confused] the Tribe's role as commercial partner with its role as sovereign.'" *Id.* at 594. The Navajo Nation could regulate contracts: "Contractual arrangements remain subject to subsequent legislation by the presiding sovereign.... *Without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction*, and will remain intact unless surrendered in unmistakable terms." *Id.* at 594-595 (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 147-148 (1982) (emphasis by the Ninth Circuit Court of Appeals). The court held

that the Navajo Nation could regulate commercial activities by non-Indian businesses and impose liquidated damages and exclusion as proper enforcement tools.

Therefore, using the Treaty of 1868, the Navajo Nation has the power to regulate non-Indian businesses. Even if the tribe has entered into a leasing or other commercial arrangement by contract in its capacity as a "commercial partner," it still retains the governmental power to regulate that business.

## B. INHERENT POWERS

Inherent powers decisions of the Congress, courts and administrative agencies are ones which explore the powers "reserved" by Indian tribes. Congress added statutory recognition of them to the recognition contained in the many Indian treaties in enacting the Indian Reorganization Act of 1934, 48 Stat. 984. Section 16 of that Act enumerates statutory powers for the tribes which elected to organize under it, including "powers vested in any Indian tribe or tribal council by existing law." 47 Stat. 987. "Existing law" is the inherent power of Indian governments, and although the Navajo Nation did not choose to organize under the Indian Reorganization Act, it has them.

In 1934, shortly after passage of the Act, the Commissioner of Indian Affairs asked for an Interior Department solicitor's opinion on what those powers were. That opinion is "Powers of Indian Tribes," 55 *Interior Decisions* 14 (1934). The summary opinion on use of the exclusion power was that Tribes have the authority:

> To remove or exclude from the limits of the reservation nonmembers of the tribe, excepting authorized Government officials and other persons now occupying reservation lands under lawful authority, and to prescribe appropriate rules and regulations governing such removal and exclusion, and governing conditions under which nonmembers of the tribe may come upon tribal land or have dealings with tribal members, providing such acts are consistent with Federal laws governing trade with the Indian tribes.

*Id.* at 17. The section on exclusion made it clear that tribes have both the rights of a landowner and those of a government — "dominion as well as sovereignty." Therefore, tribes have the "sovereign power of determining the conditions upon which persons shall be permitted to enter its domain, to reside therein, and to do business." *Id.* at 50. Tribal powers over property are, similarly, those of a property owner and a sovereign. *Id.* at 50-56. These include broad regulatory and police powers similar to those exercised by state and local governments.

In *McClanahan v. State Tax Comm'n of Arizona*, the Supreme Court acknowledged the preexisting powers of Indian tribes, saying, "It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government." 411 U.S. 164, 172 (1973).

The Court upheld the constitutionality of Indian preference hiring in *Morton*

_v. Mancari_, 417 U.S. 535 (1974). In enacting Title VII of the Civil Rights Act of 1964, Congress exempted Indian tribes and their tribal organizations from the law by excluding them from the definition of "employer," and it allowed the preferential employment of Indians by tribes or businesses on or near Indian reservations. _Id._ at 545.

> These 1964 exemptions as to private employment indicate Congress' recognition of the longstanding federal policy of providing a unique legal status to Indians in matters concerning tribal or 'on or near' reservation employment. The exemptions reveal a clear congressional sentiment that an Indian preference in the narrow context of tribal or reservation-related employment did not constitute racial discrimination of the type otherwise proscribed.

_Id._ at 548.

The issue of tribal jurisdiction over non-Indians had been reaching greater intensity since the 1978 decision that Indian tribes did not have inherent power to try non-Indians for criminal offenses. _Oliphant v. Suquamish Indian Tribe_, 435 U.S. 191 (1978). There the Court announced a new doctrine of limitations upon tribal powers, and non-Indians hoped to extend it to the area of civil jurisdiction over non-Indians. The case which reached that issue was _Montana v. United States_, where a state challenged the Crow Tribe's exercise of powers under the First Treaty of Fort Laramie of 1851 and the Second Treaty of Fort Laramie of 1868, by regulating hunting and fishing on the Crow Reservation by nonmembers, including activities on fee lands within the reservation. 450 U.S. 544 (1981). The portion of the Court's decision which is important here is that which refused to fully extend the Oliphant "diminished status as sovereigns" doctrine to civil jurisdiction. The Court ruled:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.
>
> ....
>
> A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

_Id._ at 565-566.

That ruling makes a distinction between tribal regulation of activities generally and regulation where it affects conduct on fee lands. Following the confinement of Indian nations to their reservations toward the end of the 19th Century, federal policymakers decided to try a grand experiment to "civilize" Indians by

allotting lands to them as private owners. Those lands soon began to fall into private, non-Indian, hands, with massive land fraud. As a result, there are large areas of non-tribal, non-Indian "fee lands" within most reservations, with the resulting problem of the extent to which tribal governments could continue their time- and treaty-honored ability to regulate conduct upon them.

We do not reach the question of whether the Navajo Nation may regulate activities on fee land in this case. The December 1, 1960 lease stipulates, in section 3 of its preamble, that "the Company desires to construct and operate on lands to be leased from the Tribe ... a large thermal electric power plant *on the Reservation*." (emphasis supplied). The definitions of "Four Corners" and "Initial Four Corners Plant" in the 1966 lease amendment stipulate that both are "located on the *Navajo Reservation* near Shiprock, New Mexico." (emphasis supplied). Therefore the Navajo Nation need not show the governmental interests required by the second step in the *Montana* test.

Even if *Brendale v. Confederated Tribes and Bands of the Yakima Nation* applied to this case, which it does not since that decision only involved the question of zoning fee patent land, the Navajo Nation could satisfy the political integrity, economic security, health and welfare test proposed by a majority of the Supreme Court. 492 U.S. 408. *Brendale* has little precedential value because it only reached a majority result, without a majority opinion. *Id.* The only part of the *Montana* test which we need to apply is that which allows the Navajo Nation, in the exercise of its inherent sovereign powers, to regulate the activities of nonmembers who enter into consensual relationships with the Navajo Nation or its members by means of commercial dealings, contracts, leases, or other arrangements.

In *Merrion v. Jicarilla Apache Tribe*, the Supreme Court dealt with the question of whether mineral lessees could evade tribal taxation because the leases entitled them to enter the reservation and thus exempt them from further tribal regulation. 455 U.S. 130, 145 (1982). The Court rejected the argument, initially noting that there is a difference between a tribe as a commercial partner and the tribe acting as a sovereign. *Id.* at 145-146. The "consent" test is broad enough to include the simple presence of a non-member.

> Whatever place consent may have in contractual matters and in the creation of democratic governments, it has little if any role in measuring the validity or an exercise of legitimate sovereign authority. Requiring the consent of the entrant deposits in the hands of the excludable non-Indians the source of the tribe's power, when the power instead derives from sovereignty itself ... Indian sovereignty is not conditioned on the assent of a nonmember; to the contrary, the nonmember's presence and conduct on Indian lands are conditioned by the limitations the tribe may choose to impose.

*Id.* at 147-148.

*Babbitt Ford, Inc. v. Navajo Indian Tribe*, is a post-*Montana* decision which applies its rule. 710 F.2d 587, 592-593 (9th Cir. 1983). That decision upheld

Navajo Nation legislation which prohibited the repossession of motor vehicles found within its boundaries without the purchaser's consent at the time of the event, or without a court order. "Thus, by entering the reservation to conduct repossessions, Babbitt and Gurley [motor vehicle companies] are subject to the Tribe's exercise of sovereign power." *Id.* at 595.

*Kerr-McGee Corp. v. Navajo Tribe of Indians*, is of limited application because it reached only the narrow point of whether the Navajo Nation needed secretarial approval of possessor interest and business activity taxes. 471 U.S. 195, 198 (1985). However, we note that this was another situation of a non-Indian business which challenged the imposition of sovereign authority after it had entered the Navajo Nation for business activities. The Supreme Court restated its prior holding that the power to tax is "an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management." *Id.*

Now we reach a case more directly on point — that of *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1331 (9th Cir. 1990). FMC was a non-Indian company which had an elemental phosphorus plant on *fee* (not tribal) land within the Shoshone-Bannock Reservation in Idaho. It was the largest reservation employer, and it obtained all the phosphate shale used at the plant from mining leases on lands owned by the Tribes or by individual Indians. *Id.* at 1312. When the Tribes enacted their Tribal Employment Rights Ordinance (TERO), with a preference hiring requirement, FMC objected. However, it later entered into an employment agreement based upon the TERO. When FMC violated the agreement and the ordinance, the Tribes filed a civil action in their tribal court. Justice Meyers of the Appellate Division of the Shoshone-Bannock Tribal Court upheld the validity of the ordinance in one opinion, and he later entered orders granting specific relief in another. *FMC Corp. v. Shoshone-Bannock Tribes, ex rel TERO Corp.*, 15 Indian L. Rep. 6023, 16 Indian L. Rep. 6026 (1988). When the Ninth Circuit Court of Appeals reviewed the tribal court decision, it applied the *Montana* test. The *Shoshone-Bannock* appellate court applied both *Montana* tests, finding both a consensual relationship between FMC and the Tribes and that the Tribes' economic security and general welfare would suffer if it could not enforce the TERO. 905 F.2d at 1314. The Ninth Circuit focused upon Montana's first test, consensual relationships. It looked at the "wide ranging mining leases and contracts" for phosphate shale and the fact FMC had recognized tribal taxing power in one of its mining agreements. It also gave its specific agreement to the TERO goal of increased employment and training. *Id.* The opinion concluded that, "FMC actively engaged in commerce with the Tribes and so has subjected itself to the civil jurisdiction of the Tribes." *Id.* at 1315.

## C. POLICE POWER

Another way of articulating reserved, inherent tribal powers is to approach them from the vantage point of police power. Police power is:

> An authority conferred by the American constitutional system in the Tenth Amendment, U.S. Const., upon the individual states, and in turn, delegated to local governments, through which they are enabled to establish a special department of police; adopt such laws and regulations as tend to prevent the commission of fraud and crime, and secure generally the comfort, safety, morals, health, and prosperity of its citizens by preserving the public order, preventing a conflict of rights in the common intercourse of the citizens, and insuring to each an uninterrupted enjoyment of all the privileges conferred upon him or her by the general laws.
>
> The power of the State to place restraints on the personal freedom and property rights of persons for the protection of public safety, health, and morals for the promotion of the public convenience and general prosperity. The police power is subject to limitations of the federal and State constitutions, and especially to the requirement of due process. Police power is the exercise of the sovereign right of a government to promote order, safety, health, morals and general welfare within constitutional limits and is an essential attribute of government.

*Black's Law Dictionary* 1041 (5th ed. 1979). While the Navajo Nation does not, as do the states, derive its powers from the Tenth Amendment to the Constitution, the initial discussion of the nature of Navajo Nation Government shows that it has equal, if not greater, powers as a result of the Treaty of 1868, which also acknowledges pre-existing powers. While there is a current trend of the United States Supreme Court to find, case by case, that Indian nations have been stripped of powers because they are inconsistent with a dependent status, the power we deal with here clearly falls within the ambit of the definition above.

Here we are dealing with two general areas of legislation — employment law and civil rights law. Both areas of state legislation sometimes collide with federal law and raise the doctrine of preemption, and we will deal with that topic now.

Non-federal labor law and non-federal civil rights law are traditional state concerns, and legislation in those fields is a valid exercise of police power. 48A Am. Jur. 2d *Labor and Labor Relations* § 1728; 15 Am. Jur. 2d *Civil Rights* § 4. Although there may be extensive federal regulation of interstate labor, such does not bar state controls of particular aspects of employer-employee relations. *Allen-Bradley Local, U.E.R.M.W. v. Wisconsin Employment Relations Board*, 315 U.S. 740 (1942). Federal legislation does not preempt traditional state civil rights statutes. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964).

APS goes to great lengths to argue that Title VII of the Civil Rights Act of 1964 preempts Navajo law. APS does so despite the fact that Congress specifically exempted Indian tribes from coverage in the Act and specifically permitted preferential employment of Indians on or near Indian reservations. 42 U.S.C. §§ 2000e(b), 2000e-2(i); *Morton v. Mancari*, 417 U.S. 535, 545 (1974). In doing so, Congress recognized the inherent powers of Indian tribes to control employment relations. *Id.* at 548. The issue of whether the Age Discrimination in Employment Act (ADEA) applied to a treaty tribe arose in *Equal Employment*

*Opportunity Comm'n v. Cherokee Nation*, 871 F.2d 937 (10th Cir. 1989). There the court reaffirmed its prior holding in *Donovan v. Navajo Forest Products Industry*, 692 F.2d 709 (9th Cir. 1982), to the effect that the ADEA cannot be applied because it would violate treaty rights and dilute principles of tribal sovereignty and self-government, recognized in a treaty. *Id.* at 938. The court reiterated that tribes are expressly excluded from Title VII and ruled that, because there was no clear indication of congressional intent to abrogate Indian sovereignty rights, the ADEA did not apply. *Id.* at 939.

As discussed above, there must be *clear* congressional intent in order to abrogate a treaty or inherent power right, and there is nothing before this Court to show that Congress intended to preempt or abrogate the sort of legislation before us here. The Title VII preemption argument also ignores the fact that the states remain free to adopt their own anti-discrimination statutes, and most have. Most have state anti-discrimination or civil rights enforcement agencies, which enforce their own laws and (on arrangement with the Equal Employment Opportunity Commission), enforce Title VII themselves.

We disposed of the issue of preemption by prior contracts or agreements with the company above in discussing the application of the *Babbitt Ford* and *Merrion* cases. The Navajo Nation, as a sovereign, at all times retains the power to protect the health, welfare and safety of its citizens, using police power.

In addition we recently said that, "[T]he right to assure justice is one of the greatest activities of the sovereign in exercising its police power, and police power modifications of contracts are permissible." *Navajo Nation v. MacDonald, Concerning Moeller, et al.*, 6 Nav. R. 222, 237 (1990) (citing United States Supreme Court decisions).

In sum, the legislation before us, which is the legislation applied to APS on review of its nepotism policy, is traditional employment and civil rights legislation, well within the police power of the Navajo Nation. We will discuss some of the policy foundations for the exercise of police power in these areas below.

## II

### APPLICATION OF THE ACT

The inquiry here is whether the Board correctly applied 15 N.T.C. § 204(b)(7) and (9) to APS' nepotism policy, and whether Navajo statutory law prohibits such a policy. Section 204(b) (7) provides: "All employers shall use nondiscriminatory job qualifications and selection criteria in employment." Title 15, N.T.C. § 605(b)(9) provides: "All employers shall maintain a safe and clean working environment and provide employment conditions which are free from prejudice, intimidation and harassment."

Stated negatively, section 204(b) (7) prohibits discrimination in adopting or applying job qualification standards and selection criteria. "Discrimination" is a word of art used in both labor and civil rights law. For example, the National

Labor Relations Act prohibits "discrimination" that encourages membership in a labor organization, and in *National Labor Relations Board v. Local 50, American Bakery & Confectionery Workers Union*, the court applied it to find an act of discrimination by a labor union during a strike. 339 F.2d 324 (2nd Cir. 1964). The court stated that, "an employee is unlawfully 'discriminated' against when a distinction is made arbitrarily or without sound basis and to his detriment." *Id.* at 327.

Among the purposes of NPEA is the protection of the health, safety, and welfare of Navajo workers. 15 N.T.C. § 602(a)(6). The Board and the courts are instructed that "the provisions of this chapter [i.e. the Act] be construed and applied to accomplish the purposes set forth above." 15 N.T.C. § 602(b). That is a command to apply the rule of liberal construction.

As employment legislation, the provisions set forth above will be given liberal construction as follows:

> Such legislation has been given a liberal interpretation in accordance with its expressed purposes. Correlatively, exceptions to the coverage of such legislation are narrowly construed. The aim of such legislation is to attain simplicity and directness. The administrative provisions of those laws must not be narrowly construed.

*Sutherland Stat. Const.* § 73.01 (4th ed. 1986).

Here, there are two things which are prohibited: Discrimination and prejudice. Prejudice, is "A forejudgment; bias; preconceived opinion." *Black's Law Dictionary* 1061 (5th ed. 1979).

There is both statutory discrimination and prejudice here. The Board correctly found that there was no demonstrated business justification for the nepotism policy, other than a general conclusion that the public "felt" APS favored relatives. APS did make a distinction, and actually made two. The policy established a general category of "nepotism," which is:

> Bestowal of patronage by public officers in appointing others to positions by reason of blood or marital relationship to appointing authority.

*Black's Law Dictionary* 937 (5th ed. 1979).

The policy then went on to subdivide that classification into two separate ones, with different consequences for each. That is to say, those who belonged to the classification "blood relatives" could apply for and receive employment with APS so long as they were removed from the blood relation by two supervisory levels. Those who belonged to the classification "relatives by marriage" could not be employed, and where APS discovered two such relatives having a job, they were given the choice of who could quit or be fired. That was a severe Hobson's choice, given the strain between family loyalty and one's own job.

The "prejudice" of the situation arises out of a policy choice, the reasons for which are absent from the record, of why an employer would distinguish between the two groups. There was a preconceived opinion that somehow it is

permissible to hire blood relatives, removing them from supervisory favors, yet not hire relatives by marriage. We hold that the prohibition on hiring and retaining relatives by marriage was a violation of the Act and that the Board correctly decided the application of the law. We make no opinion on the viability of the policy pertaining to blood relatives because that is not a question before us. There are no aggrieved parties to whom that policy was applied, to their injury.

We are also dealing with civil rights statutes here. A civil rights statute need not spell out classifications, as we will demonstrate.

The term "civil rights" is elusive because it "implies a selective reference to interests which are deemed to be of superior quality in our scheme of legal values." 3 *Sutherland Stat. Const.* § 74.01. The classes of rights which can fall under that category are open-ended in character, but they are most often concerned with personal liberty and, more recently, with the right to equal treatment. *Id.* We are dealing with equal treatment here.

State civil rights legislation is fairly recent, and prior to 1883, only three states had any. *Id.* § 74.03. Following an 1883 Supreme Court decision that the Civil Rights Act of 1875 was unconstitutional, several states enacted statutes forbidding discrimination in public accommodations. *Id.* In modern times the states have enacted comprehensive legislation to regulate the denial of equal treatment in areas such as employment, and some deal with discrimination in utility services or public services. *Id.* The laws are wide and varied, but the important point is "states are allowed to extend civil rights protection beyond that provided by Congress." *Id.* Finally, one of the common prohibited classifications is the prohibition of discrimination on the basis of one's marital status. *Id.*

Civil rights laws are also given liberal construction, meaning that they are liberally construed, "in order that their beneficent objectives may be realized to the fullest extent possible. To this end, courts favor broad and inclusive application of statutory language by which the coverage of legislation to protect and implement civil rights is defined." *Id.* § 74.05. "Correlatively, exceptions and limitations which restrict the operation of such laws are strictly construed." *Id.* "Remedial policies expressed in civil rights laws may be judicially extended through the influence they have in the interpretation of legislation." *Id.*

Having reviewed the ground rules for the application of civil rights legislation, do we have a prohibition of marital status discrimination here? We begin with the rule that the right to marry is a fundamental right. It is an important and fundamental right as a matter of Navajo common law as well.

> Traditional Navajo society places great importance upon the institution of marriage. A traditional Navajo marriage, when consummated according to a prescribed elaborate ritual, is believed to be blessed by the 'Holy People.' This blessing ensures that the marriage will be stable, in harmony, and perpetual. Under traditional Navajo thought, unmarried couples who live together act immorally because they are said to steal each other. Thus, in traditional Navajo society the Navajo people did not approve of or recognize common-law marriages.

*Validation of Marriage of Francisco*, 6 Nav. R. 134, 135-136 (1989) (quoting *Navajo Nation v. Murphy*, 6 Nav. R. 10, 13 (1988)). Navajos scorn those who have relationships out of marriage, and the man in such a relationship is called a "stay-until-dawn man." The woman shares the scorn because the term implies her need to sneak the man out before neighbors arise and go out.

Not only is marriage important in Navajo common law, but relatives and relationships are as well. "Navajos think of such relationships [kinship] in a much broader and different sense than does the general American population." B. Johnson, Ed., *Navajo Stories of the Long Walk Period* xix (1973) (Preface explaining relationships used in the stories). There is the biological family, with husband, wife and unmarried children; the extended family, which adds married daughters and their husbands as well as unmarried children; the outfit, with mixes of extended or biological families; the clan, with relationships which are not restricted to biological connections; and linked clans, with relationships among clans. *Id.* xix-xxi.

The APS nepotism policy as applied to married relations is ridiculous in the Navajo context because of the strong ties and obligations to relations outside the scope of the policy. The reciprocal obligation required of Navajos is summed up in the saying used to describe someone who has misbehaved: "He acts as if he had no relatives."

In *Voichahoske v. City of Grand Island*, the Nebraska Supreme Court applied the fundamental right of marriage to an employment situation. 10 EPD Par. 10,247 (1975). The City of Grand Island, Nebraska adopted a personnel rule which prohibited spouses from both being city employees. Voichahoske was a city mechanic who married a police officer. The city manager told the husband and wife one or the other must resign because of violation of the city rule prohibiting "[c]hanging status, by marriage or otherwise, which would result in more than one person in a household being on the payroll of the City of Grand Island." *Id.* at 5030. The Nebraska court identified the right to marry as a fundamental right, entitled to constitutional protection, and held that the city denied the couple equal protection of the law. *Id.* at 5032-5033. The policy was void.

In *Kraft, Inc. v. State*, 284 N.W. 2d 386 (1979), the company had a policy which prohibited full-time employment of more than one member of an immediate family. That included "father, mother, husband, wife, son, daughter, stepson or stepdaughter, brother, sister and in-laws." *Id.* at 387. Four part-time company employees sought better full-time positions, and they filed complaints with the Minnesota Department of Human Rights claiming the company policy was marital status discrimination. *Id.* The Minnesota Supreme Court interpreted the statutory prohibition in light of "the protected status the institution of marriage enjoys in our society." *Id.* at 388. It also noted that such a policy could discourage employees from marrying:

> In a locale where a predominant employer enforced such a policy, economic pressures might lead two similarly situated individuals to forsake the marital union and live together in violation of Minn. Stat. § 609.34. Such an employ-

ment policy would thus undermine the preferred status enjoyed by the institution of marriage.

*Id.* The court also noted that while the policy would discourage married couples, it did not "discourage two romantically involved employees from living together," causing discrimination through an unequal application of a seemingly neutral employment policy in violation of Title VII. *Id.* at n. 3. The court then held that the policy was invalid under Minnesota law. *Id.*

The Board made a finding of fact which shows a proper application of the law and the serious violation of the public policy favoring the sanctity of marriage. The Board's finding shows that the Minnesota court was correct in its prediction of how a marital status employment policy can discourage marriage. One of APS' employees had been a power plant mechanic for about two months, and when he updated his employment application, APS agents informed him he was ineligible for rehire because his wife was a permanent employee. The couple obtained a divorce from the Shiprock District Court so he could qualify for rehire. He could not work for APS for three months because of his marriage, and when he requalified for employment by obtaining a divorce, it took him another year to get a job. APS forced this couple to divorce, given economic conditions.

In these decisions we have a governmental employer's marital status policy prohibited on the grounds of public policy, and a marital status discrimination statute applied in light of that policy. Are there any other policy factors which support the interpretation of our law in a similar fashion against this private employer?

In their work, *Fairness and Justice* (1986), Charles M. Haar and Daniel W. Fessler trace the history of the common law rule that those who provide a public service, including municipalities and corporations such as the one before the Court, must give equal treatment. They base their arguments upon the common law and show that equal access to basic services should be grounded in the common law and not constitutional law, which is defective in many respects.

The same argument was developed by the California Supreme Court in *Gay Law Students Ass'n v. Pacific Telephone Telegraph Co.*, 156 Cal. Rptr. 14, 595 P.2d 592 (1979). There the court dealt with the question of whether the company could discriminate against homosexuals in the hiring, firing, and promotion of employees. 595 P.2d at 592. In its opinion, the court examined the company's common law obligations as a public utility, opening with the observation that:

> Since medieval times, the common law has imposed various obligations upon enterprises that exercise monopoly power to assure that such power is not exerted in an arbitrary or discriminatory manner. Initially, common law courts justified such judicially imposed restrictions on the theory that the holders of monopoly power possessed their authority by virtue of a grant of power or license from the governing English crown. In order to retain the delegated right to exercise such power, monopolists were obligated to comply with an implied covenant that such authority be utilized for the good of the public weal and not be abused for personal motives or prejudices. Centuries later, this 'royal privi-

> lege' doctrine evolved into a broad common law principle which placed numerous obligations, including an obligation to avoid discriminatory conduct, upon enterprises said to be 'affected with a public interest.'

*Id.* at 603. Recognizing the company was a public utility, the court turned to section 453(a) of the Public Utilities Code and applied it in light of that common law obligation. That code section prohibited preferences or advantages to any person or subjecting any person to any prejudice or disadvantage, and the court stated that it bans arbitrary discrimination in any respect, including arbitrary discrimination in the hiring, promotion, or termination of employees. *Id.* Another ground for the final decision was the common law rule that where one has a monopoly on the supply of labor, there can be no discrimination because of the fundamental right to work for a living. *Id.* at 606. The court, again applying section 453(a), ruled:

> Having assumed the role of a public service enterprise, the management of a public utility must forgo any prerogative to base its employment decisions on personal whim or prejudice; by virtue of its public service status, the public utility can claim no common law authority arbitrarily to exclude an entire class of individuals from employment opportunities without regard to such individuals' qualifications or fitness for the job.

*Id.* at 608.

The Navajo statute is very similar to section 453(a) because it too prohibits discrimination. Within the Navajo Nation all employers are in the nature of a public service enterprise, given high unemployment rates. We take judicial notice of the fact that when the Navajo Tribal Council enacted NPEA it did so to deal with unemployment rates much higher than the general population. There was sufficient governmental interest to enact statutes which prohibit discrimination, prejudice, intimidation, and harassment.

We make one final comparison to a civil rights statute, the California Unruh Civil Rights Act, which provides:

> All citizens ... are free and equal, and no matter their race, color, religion, ancestry, or national origin are entitled to full and equal accommodations ... in all business established of every kind whatsoever.

The case of *In re Cox* involved the arrest of a shopping mall customer who was charged with the municipal offense of remaining upon "business premises after being notified by the person in charge thereof to remove therefrom." 90 Cal. Rptr. 24, 474 P.2d 992, 993 (1970). Cox's defense was that the Unruh Civil Rights Act does not allow such business rights, and the California Supreme Court held "that the act does not sanction any such arbitrary exclusion of a customer." *Id.* The early common law rule was that enterprises which were "public," "common," or "affected with a public interest" were deemed to hold themselves out as providers of a particular product or service. Therefore, they had certain obligations, including that of serving all customers on reasonable terms and with-

out discrimination. *Id.* at 996.

California is one of four states which adopted the Field Code, a codification of common law principles. L. Friedman, *A History of American Law* 353 (1973). Without acknowledging the Field Code, the California Supreme Court noted that the state adopted a provision incorporating that common law doctrine in 1897. *Cox* at 996. That statute was applied to keep the manager of a race track from expelling "a patron who had acquired reputation as a man of immoral character," and from barring homosexuals from bars and restaurants. *Id.* at 997. In the late 1950s, the California Legislature, concerned about the narrow scope of covered businesses, amended the law as quoted above. *Id.* Thus, the intention of the Legislature was to prohibit "all arbitrary discrimination by business establishments." *Id.* at 999.

In *Isbister v. Boy's Club of Santa Cruz, Inc.*, the court applied the statute to hold that a boy's club could not discriminate against girls. 40 Cal. 3d 772, 707 P.2d 212 (1985). In doing so the court held that the Unruh Act prohibits "arbitrary" discrimination of any kind, despite the fact the statute sets out some prohibited classifications. *Id.* at 221.

To recapitulate, one Navajo statutory provision requires that all employers use nondiscriminatory job qualifications and selection criteria, and another prohibits prejudice, intimidation and harassment in the workplace. The rights involved here are the fundamental ones of the right to marry (and have that relationship honored) and the right to a fair opportunity for employment. There are fundamental Navajo common law rights in the form of marriage, free association with relatives, and the preservation of traditions of working together. Public policy, including the ability of the state to place limitations upon arbitrary standards for employment, supports the ruling of the Board, and such underlies the Navajo Nation Preference Law.

At this point it is quite important that everyone understand what this opinion does *not* hold . We do not address the nepotism policy as far as it affects blood relations. We simply hold that the Board correctly interpreted and applied the law to prohibit marital status discrimination, and that our law is fully backed by principles of public policy and common law. We do not rule that APS must favor relatives in any manner, but only that employees should be chosen on the basis of their merit and qualifications and not some broadly preconceived notion of what may be proper employment limitations, when that notion has no demonstrated relation to work performance. There are other proper means of achieving the goal of eliminating favoritism, and we leave what they are to APS and the Board.

## III

### JURISDICTION

We have already touched upon the preemption questions and ruled that no policy of federal Indian affairs law and no applicable act of Congress prohibits the Navajo Nation from adopting employment or civil rights statutes which forbid marital status discrimination.

APS makes another jurisdictional argument; that the Board is illegally acting as a quasi-judicial body, and somehow that is forbidden. This argument may be disposed of quickly, because it is frivolous.

There are many agencies which exercise quasi-judicial powers, and the people of the Navajo Nation are familiar with them. Each day Navajos appear before an administrative law judge of the Social Security Administration; before the Office of Hearings and Appeals, for probate matters; before the Veteran's Administration; before the Indian Health Service; and before many others. Navajos appear before quasi-judicial state bodies to determine their claims for workers' compensation or for unemployment compensation. It cannot be said that boards exercising quasi-judicial functions are not commonplace, and the states of the American West commonly appoint citizen boards to exercise such functions. The rule is:

> Merely because a board or commission is a body belonging to the executive or administrative body of the government, it by no means follows that it may not perform functions which are, in their nature, judicial, and possess and exercise quasi-judicial powers. Statutes conferring quasi-judicial powers and duties upon administrative agencies have been held not to be unconstitutional as encroachments upon the judicial branch of government, especially where such powers and duties relate to matters which are peculiarly affected with public interest or are subject to regulation under police powers, or where provision is made for appeal from decisions of such agencies to the courts.

1 Am. Jur. 2d *Administrative Law* § 145.

The Navajo Nation, as it is with any government exercising its police powers through a board, has the full right and power to use contemporary administrative law as a model for governing and to create a quasi-judicial board, as the Navajo Tribal Council has done here.

As for jurisdiction, APS is an "employer" within the meaning of 15 N.T.C. § 603(3), because it is a corporation engaging the services of persons for compensation as employees. The Board has the power to hear formal complaints of violations of NPEA pursuant to 15 N.T.C. § 610(d), at which instance the Board is required to conduct a hearing pursuant to 15 N.T.C. § 611.

We have previously addressed the role of this Court in reviewing the decisions of Navajo Nation administrative agencies, with or without a grant of specific jurisdiction, and we reaffirm our prior ruling in *Navajo Skill Center v. Benally*, 5 Nav. R. 93 (1986).

## IV

### DUE PROCESS

This Court has jurisdiction over the Board's administrative decision pursuant to 15 N.T.C. § 613. The Board tells us that the scope of review on appeal is limited to questions of law. 15 N.T.C. § 612(c)(6). Whether or not APS received a

fair hearing is a question of law, because the right to a fair hearing is guaranteed as an element of due process.

Although APS raised numerous due process issues, we entered an order limiting the ones which will be addressed in this appeal following a stipulation of the parties. They are 1) The impartiality of the Board; and 2) Quorum requirements and member participation.

## A. QUORUM AND HEARING.

Hearings upon ONLR complaints are governed by 15 N.T.C. § 611. Subsection (c) (3) of that statute provides as follows: "The Board shall issue its decision by a majority vote of a quorum present and shall be signed by the Chairman of the Board." Three members of the Board constitute a quorum. 15 N.T.C. § 205(a). The record shows that three Board members were present during the two-day hearing (Manuelito, Seaton and Hale), and that they were the only Board members who voted on the decision. While two members were absent for part of the hearings, they did not participate in the decision. Under our law the decision is valid.

However, APS expresses a legitimate concern. If an absent member votes on a matter where he or she was unable to hear the evidence, or at least read a transcript of the evidence, that raises serious questions of whether that person is exercising the independent judgment required, after hearing all the evidence.

## B. BIAS

The essential complaint here is that after one witness had been called to testify, a Board member commented:

> I would like to encourage that that policy be changed and that you should do
> away with the relative policy.

The general administrative law approach is that "an expression of opinion ... does not without more, show that an agency member cannot maintain an open mind during the hearing stage of the proceeding. *Ass'n of Nat'l. Advertisers v. F.T.C.*, 627 F.2d 1151, 1173 (1979).

Before leaving this point by citing the general rule, we need to put the complaint of bias in context. Bias may arise in a number of ways, and it can be open or subtle. It can arise from friendships, relationships, corruption, or many other causes, and it is not sufficient to generally claim bias when the question being dealt with is one of general policy. The question before the Board was the application of Navajo law to an employment policy dealing with marital relationships. While some boards or courts would withhold comment on a previous policy view on such a policy, reserving the view and comment for the final decision, such is not necessarily the Navajo way. Navajos in public positions are used to debate, questioning, and commentary upon the events taking place, as any one who has

ever attended a chapter meeting, council session, or board meeting may attest.

APS did not show any prejudice from the comments alluded to. As noted, this Court will treat violations of due process as questions of law, but the conduct cited does not show an unfair hearing or unreasonable bias by the Board. People are entitled to have opinions and to express them, and that includes members of administrative boards. If, on the other hand, the question before the Court was one of bias in connection with a close question of fact, we would give the claim much greater attention.

## V

### CONCLUSION

We conclude our analysis by restating that the scope of our decision is the validity of the two statutory sections discussed and not the validity of the Navajo Preference in Employment Act in the granting of preference to Navajos. All too often parties come before this Court seeking to raise broad questions so that they may exhaust their tribal remedies and commence some sort of suit against the Navajo Nation. We reserve the usual judicial function of deciding only that which is placed before us unless there is a compelling need to broaden the scope of an opinion. As it is with most appellate courts, we do not give advisory opinions and we require an actual case or controversy before adjudication.

The Board found that no individual has filed any claim against APS alleging a violation of 42 U.S.C. § 2000e-2(i), and APS presented no evidence any non-Navajo Indian applicant had been denied employment because of its compliance with the Navajo Preference in Employment Act. If, in the future, APS finds itself caught between the conflicting obligations imposed by separate commands from distinct sovereigns, it can file a complaint with the Office of Navajo Labor Relations pursuant to 15 N.T.C. § 610(b). Then, if a solution cannot be reached, the Office must refer the complaint to the Navajo Labor Relations Board under section 610(d). APS must first give the Navajo Nation the opportunity to decide the application of its own law, in light of an actual case or controversy.

Ultimately what we have is a Navajo law which regulates employment. It prohibits arbitrary discrimination, and that is what the Board found in a well-stated and well-reasoned opinion. Upon a close examination of Navajo law we found that it reasonably addressed the employment policy in question — marital status discrimination — and prohibited it. The Board's reasoning was appropriate. While that reasoning may not be the same as that used by the Court, it is sufficient that it appropriately applied the law.

The February 9, 1987 administrative decision of the Navajo Labor Relations Board is affirmed.